**Earl Lawrence SQUIRES, Petitioner,**

v.

**Rufus FLEMING, Warden, Virginia State Penitentiary, Respondent.**

**Civ. A. No. 85–0604–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

April 27, 1987.

---

Robert J. Rice, Bermner, Baber & Janus, Richmond, Va., and Fred A. Talbot, for petitioner.

Robert H. Anderson, III, Jacqueline G. Epps, Sr. Asst. Atty. Gen., Richmond, Va., for respondent.

## MEMORANDUM

MERHIGE, District Judge.

The petitioner, Earl Lawrence Squires, seeks habeas corpus relief pursuant to 28 U.S.C. § 2254, alleging ineffective assistance of counsel in violation of the sixth and fourteenth amendments to the United States Constitution. Petitioner is currently serving a life sentence at the Virginia State Penitentiary within this judicial district.

The record reflects the following:

Petitioner Squires was convicted in the Circuit Court for the City of Virginia Beach on July 16, 1977, for the murder of Wayne C. Chitwood, Jr. On March 10, 1978, the Virginia Supreme Court denied Squires' petition for appeal of that conviction. Thereafter Squires, proceeding *pro se*, filed a Petition for Writ of Habeas Corpus in the Circuit Court for the City of Virginia Beach. The Circuit Court denied that petition on January 20, 1983. Squires then appealed the Circuit Court's denial of the petition to the Virginia Supreme Court. This appeal was denied on April 19, 1984.[1] Petitioner subsequently filed the instant lawsuit.

In his original petition, Squires stated nineteen separate claims of ineffective assistance of counsel. By order of March 13, 1986, however, Judge Warriner dismissed five of the asserted claims denoted as (f), (g), (j), (r), and (t). After the matter was transferred to the undersigned, the case was heard on the merits and taken under advisement. The Court is now prepared to render its decision.

*Factual Background*

At about 10:45 p.m. on the night of October 7, 1984, a security guard at a shopping mall in Virginia Beach, Virginia, noticed for the first time that a green Oldsmobile was parked in the lot. A number of days passed; however, no one retrieved the car. The guard later examined the car and noticed that its ignition key was jammed in the ignition. On October 16, the police were summoned. Blood stains around the locked trunk excited suspicions of foul play. They were confirmed when the trunk was forced open. Inside was the body of Wayne Chitwood, 36, a local retailer of used autos who had been reported

---

1. The petitioner has therefore exhausted all available state remedies. Although respondents contend that three of petitioner's 19 claims were not exhausted, this Court, through Judge Warriner's denial of respondents' Motion for Summary Judgment, has already decided that these federal claims "were fairly presented" to the Virginia Supreme Court and are now ripe for disposition.

missing some days earlier. Chitwood had been beaten and shot four, possibly five times in the upper body and head.

The police soon determined that the last place that Chitwood had been seen was Beach Auto Wholesalers, an auto wholesale and retail business located at 220 Witchduck Road in Virginia Beach. That business was run by Earl Lawrence Squires, better known as "Larry." Squires had run the auto lot at 220 Witchduck himself for less than four months; previously, he had been employed at the same address by Donny Ward, his brother-in-law. Ward's auto business was incorporated under the name of "Donny Enterprises." Chitwood had been a partner in Donny Enterprises, but had ended his association with Ward some months prior to his death.

Police soon surmised from Squires and a number of other witnesses that Chitwood had arrived at Virginia Beach Auto Wholesalers around 5 o'clock on October 7, 1984, driving the used green Oldsmobile in which his body was later found. Squires told the police that the two men discussed the sale of the car and that Squires decided not to buy it. According to Squires, Chitwood then left the lot. There were no further reports of Chitwood having been seen until the time his body was found in the trunk of the car nine days later.

The police's attention soon focused upon Ward, Chitwood's former business partner. It is not clear what evidence the police may have had connecting Ward with the murder. Certainly there were factors suggesting his involvement. Ward was the sole owner of stock in Donny Enterprises which was itself the beneficiary of a $50,000 "key man" insurance policy insuring the life of Wayne Chitwood. Although Ward and Chitwood had ceased to be partners some months before Chitwood's death, payments on the policy had been kept up following the dissolution of their partnership. In addition, Ward's business was reportedly in financial difficulty and he may have been in default on loans totaling over $20,000.

When questioned by the police, Ward provided information that implicated Squires and another man, J.E. "Buddy" Watson, III, in a conspiracy to kill Chitwood. At the behest of the police, Ward made a number of telephone calls to Watson in early November, 1974, in which the two men discussed what ought to be done about cashing in the insurance policy on Chitwood's life. Ward asked questions clearly intended to elicit from Watson details of his possible involvement in the Chitwood murder. The police taped these conversations and considered them sufficiently incriminating as to justify seeking a grand jury indictment against Watson and Squires. The two men were arrested November 6, 1974, as was Lee Queensbury, an employee of Squires who worked at Beach Auto Wholesalers. At a preliminary hearing held November 7, the prosecution presented their evidence against the men. The judge certified murder charges against Watson and Squires to a grand jury.

On December 2, 1974, the grand jury returned an indictment against Squires and Watson for the murder of Wayne Chitwood. The prosecution, however, successfully moved to enter a nolle prosequi to the indictments against both Watson and Squires on August 26, 1975. Commenting upon the decision not to go forward with the case, the prosecutor stated that the Commonwealth simply had "no evidence."

Dismissal of the indictments brought proceedings in the Chitwood murder to a temporary halt. The pause lasted almost 17 months. That it did not last longer was due directly to Larry Squires' increasing involvement in a variety of extra-legal activities, an involvement that brought him to the attention of local, state, and federal law enforcement personnel. As part of Operation Seawall, a large scale undercover scheme carried out in the Norfolk area, Squires' acquaintance was cultivated by an FBI agent, James Cross, who successfully passed himself off to Squires as a member of the Michigan underworld. The two men became friends.

During the course of their illicit dealings, Squires mentioned to Cross his previous indictment on a murder charge. Cross, who had been informed by local authorities of their continuing interest in Squires re-

garding the Chitwood murder, was anxious to hear more. In November of 1975, he succeeded in drawing out Squires on the subject on two occasions. The second of these occurred at Cross' apartment. There, in a conversation that was monitored by a federal and local agent and tape recorded by them, Squires told Cross that he had shot Chitwood in the offices at 220 Witchduck Road.

Squires put forward a number of reasons for the killing. First, he claimed that he had been the beneficiary of the $50,000 key man insurance policy on Chitwood's life. He also claimed that Chitwood had cheated him on various business deals and that Chitwood had revealed some of Squires' extramarital affairs to Squires' wife.

On February 7, 1977, as a result of the above conversations, Squires was reindicted for the murder of Wayne Chitwood. Squires eventually retained Michael Dills as defense counsel. Dills had previously represented Squires on a number of other criminal charges arising out of the "Seawall" operation. On March 24, Squires received a sentence of 15 years for his conviction of check counterfeiting. On March 28, Squires pled guilty to charges of cocaine possession and distribution. In both of these proceedings, Squires was represented by Dills.

On May 12, 1977, Dills filed a motion to dismiss the indictment on speedy trial grounds. His anticipation of success on this defense was heightened when the Commonwealth chose not to oppose the motion. Nevertheless, on May 28, the trial judge issued an order denying the motion.

At trial, the prosecution presented evidence that Chitwood was an auto retailer who knew Squires professionally. It produced witnesses who testified to Chitwood's plans to go over to Squires' lot in the early evening of October 7. These witnesses also testified that they never again saw Chitwood alive after he left his own establishment on the trip to Squires.' The prosecution further established that the body found in the trunk of the green Oldsmobile parked at the Pembroke Mall Shopping Center on October 16th was Wayne Chitwood's. A medical examiner testified that Chitwood had been beaten in the face and body and shot four or five times from the rear.

A police forensic scientist testified that lubricating oil and particles of "quick dry" compound, a substance used for cleaning up oil spills, were present on Chitwood's body. Another forensic expert matched the quick dry compound found on Chitwood's body to some recovered by a police officer from Squires' garage. There was also testimony as to the $50,000 key man insurance policy maintained on the life of Wayne Chitwood, that the beneficiary of this policy was the corporation Donny Enterprises, and that Squires was at one time a director of this corporation.

The crucial evidence against Squires was provided by agent Cross. Cross testified to the close personal relationship he had formed with Squires during the course of his undercover work. According to Cross, Squires raised the subject of his previous indictment for murder on several occasions. When Cross asked Squires if he had "actually pulled the trigger" Squires allegedly replied "Hell, yes I did." The tape recording made of two men's conversation and played before the jury contained Squires' assertion that he had shot Chitwood four times and his explanation of the factors that had motivated the murder. These factors included, as discussed above, the insurance policy, the prior business dealings that had led to "bad blood" between the two men, and Chitwood's allegedly informing Squires' wife of Squires' adultery.

The theory the defense presented at trial was that Squires, in an effort to impress this underworld figure, as he believed Cross to be, was "talking tough." The defense attempted to establish that the entire "confession" was just so much bravado by pointing out the inconsistencies in Squires' statement to Cross as well as the many outright lies it contained.

The jury, however, apparently chose to believe the substance of the confession and convicted Squires for the murder of Chitwood.

*Merits*

 Petitioner alleges that he was denied the effective assistance of counsel guaranteed by the sixth and fourteenth amendments. In analyzing such a contention, a court must decide whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). Accordingly, a court considers two issues: first, whether counsel's performance was deficient, falling below an objective standard of reasonableness; and second, whether that deficient performance prejudiced the defense. *Strickland, supra,* 466 U.S. at 687–88, 104 S.Ct. at 2064. The prejudice requirement is met if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. at 2068. The petitioner bears the burden of satisfying both of these requirements.

Petitioner's fourteen remaining claims may be distilled into three major categories: (1) counsel's failure to pursue an alternative perpetrator theory, (2) counsel's failure to present exculpatory evidence of petitioner's innocence, and (3) miscellaneous claims relating to various of counsel's statements and actions. Applying the two-prong test described above, the Court is satisfied that petitioner has not demonstrated that he is entitled to relief with respect to any or all of these claims. Accordingly, his petition will be denied.

1. *Counsel's failure to pursue an alternative perpetrator theory.*

Petitioner alleges that trial counsel failed to introduce evidence that someone else, namely Donald Ward or Buddy Watson, had killed Wayne Chitwood. Petitioner makes several allegations relative to this alleged failure. Specifically, petitioner claims that:

(a) trial counsel did not introduce evidence to support his theory that someone else killed Chitwood or that Watson had

previously been arrested in 1974 and charged with Chitwood's murder;

(b) trial counsel failed to subpoena Ward to testify at trial, relying on the Commonwealth's assurances that he would be present. On the morning of trial, counsel was notified that Ward would not be present; however, counsel failed to seek a continuance to secure Ward's attendance. Petitioner also asserts that trial counsel failed to interview Ward, and failed to elicit evidence that Ward had procured an insurance policy on the decedent as a business partner which was maintained after the two ceased to do business, and that Ward was indebted to Watson;

(c) trial counsel subpoenaed but failed to introduce bank records to show the indebtedness of Ward to Watson;

(d) trial counsel failed to introduce transcripts of phone conversations between Ward and Watson allegedly implicating them in the murder of Chitwood;

(h) trial counsel failed to call at trial a potential witness who heard Ward and Watson joke about how nice it would be if something were to happen to Chitwood; and

(i) trial counsel failed to call at trial a witness who heard Ward state that he would kill Chitwood in a "heartbeat."

 Under *Strickland,* petitioner must first establish that these decisions constituted deficient performance viewed in light of all the circumstances at the time, and not through hindsight. To do so, petitioner must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and that the challenged action was merely part of sound trial strategy. *Strickland, supra,* 466 U.S. at 689, 104 S.Ct. at 2065.

 With respect to claims (d), (h), and (i), the Court determines that trial counsel's failure to introduce the evidence was part of sound trial strategy. Accordingly, these claims cannot be considered as evidencing deficient performance.

In claim (d), petitioner contends that trial counsel should have introduced transcripts of phone conversations between Ward and

Watson which Ward permitted the police to record. The purpose of the calls was to elicit incriminating statements from Watson. A review of these transcripts, however, indicates that they are ambiguous and, therefore, would have provided little support for the alternative perpetrator theory at trial. More importantly, they may be viewed as further implicating the petitioner. Recognizing these problems, together with the possibility that the transcripts would be excluded from evidence as hearsay, trial counsel opted not to attempt to put this evidence before the jury.

In claims (h) and (i), petitioner contends that trial counsel should have called two witnesses that allegedly overheard certain statements by Ward and Watson in reference to Chitwood's death. In his testimony before this Court, trial counsel stated that he did not call these witnesses because he did not believe they were credible, and that he made this decision after consulting with the petitioner. Petitioner has presented no evidence to rebut the presumption that this decision was a sound one. *See Strickland, supra,* 466 U.S. at 689, 104 S.Ct. at 2065.

With respect to claims (a), (b), and (c), petitioner's contention that these claims taken together represent a possible defense theory that someone other than the petitioner killed Chitwood contains some validity. Trial counsel, however, did not pursue this theory. Petitioner asserts that this failure constituted deficient performance.

■ Because an attorney's performance must be evaluated in light of all circumstances, the determination of deficiency is extremely difficult, especially in a case where alleged evidence of an alternate defense theory is largely unknown. Therefore, without deciding whether trial counsel's performance was deficient, the Court determines that these claims can be disposed of on the prejudice prong of the *Strickland* test. The Court in *Strickland* stated that there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *Strickland, supra,* 466 U.S. at 697, 104 S.Ct. at 2069.

■ In order to satisfy the prejudice prong of *Strickland,* the defendant must prove that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. It should be noted that the Commonwealth's evidence against the petitioner in this case was substantial, including a tape recording procured by an undercover agent in which petitioner admitted to having committed the murder. Consequently, petitioner bears a heavy burden in attempting to satisfy this prejudice requirement. The record here simply does not support petitioner in this regard.

■ Petitioner's allegations in claim (b) that Donald Ward would have provided exculpatory testimony are speculative and unsupported. Petitioner has not shown that Ward's testimony would have exonerated Squires. In fact, based on certain tape recordings and statements given to the police, it is reasonable to assume that Ward's testimony would have implicated Squires in a conspiracy to commit murder. Nor is there any reason to believe that Ward would have inculpated himself. At trial, defense counsel called Buddy Watson as a witness; however, Watson asserted his fifth amendment privilege and refused to answer any questions. It is logical to assume that Ward, like Watson would have exercised his fifth amendment right and not testified about matters implicating his own guilt. Therefore, petitioner has failed to demonstrate that any prejudice resulted from the failure to subpoena Ward.

■ Petitioner's remaining allegations, contained in claims (a), parts of (b), and (c), are more troublesome. Petitioner contends that trial counsel was aware of and should have introduced evidence to show that: the "key man" life insurance policy on Chitwood's life for which Donny Enterprises was the sole beneficiary was maintained

some months after Chitwood had ceased being a partner; trial counsel subpoenaed but failed to introduce bank records which might have indicated that Ward and Watson were cosigners of a note which had not been paid; and trial counsel failed to demonstrate that Watson had previously been arrested with petitioner and charged with conspiracy to commit murder.

In essence, petitioner contends that trial counsel should have brought this evidence before the jury to establish that others had a motive for murdering Chitwood and that the police, at one time, believed that the evidence sufficiently implicated Watson's involvement to warrant his arrest. The issue, then, is whether there is a reasonable probability that, had the evidence been introduced, the jury's verdict would have been different. *See Strickland, supra,* 466 U.S. at 694, 104 S.Ct. at 2068.

In making such a determination, the Court must analyze such evidence in the context of other evidence submitted at trial. The most significant evidence was the petitioner's taped confession, in which he claimed to have shot Chitwood in the office of his garage. This confession was corroborated by the fact that an oil-absorbing compound was found on Chitwood's clothing and also on the premises of petitioner's garage. Additionally, it was undisputed that Chitwood had arrived at petitioner's garage the evening of his death and was never seen to leave. Finally, petitioner himself took the stand and denied that he killed Chitwood. The jury, however, chose to disbelieve him.

In light of this evidence, the Court is satisfied that the requisite degree of prejudice has not been established. Evidence that others may have had a motive to kill Chitwood, without more, simply pales in comparison to the incriminating evidence submitted against petitioner in this case. Accordingly, the Court now turns to petitioner's contention that trial counsel failed to present certain exculpatory evidence.

2. *Counsel's failure to present exculpatory evidence of petitioner's innocence.*

■ The thrust of trial counsel's defense was to rebut the Commonwealth's case of proving beyond a reasonable doubt that petitioner killed Chitwood. However, petitioner alleges that exculpatory evidence relating to this defense was not introduced at trial even though trial counsel knew of its existence. Specifically, petitioner alleges:

(k) trial counsel failed to introduce an available forensic ballistics report indicating that Chitwood was killed with a .38 mm and not a .9 mm bullet, in order to refute petitioner's confession that he killed Chitwood with a .9 mm bullet;

(*l*) trial counsel failed to introduce an available forensic report showing no signs of human blood in the sink of petitioner's garage, in order to refute the Commonwealth's theory that the murder took place in petitioner's garage; and

(m) trial counsel failed to introduce an available forensic report that showed soil samples taken from Chitwood's car tires contained soil which was not attributable to the soil in or around petitioner's garage.

Even assuming trial counsel's performance was deficient with respect to his failure to introduce these specific forensic reports, petitioner has not shown that any such deficiency likely affected the outcome of the trial. To the contrary, it appears that these reports would have had little or no impact.

The ballistics report reflects that Chitwood was killed with a .38 mm bullet. Accordingly, petitioner contends that its introduction at trial would have reduced the credibility of his tape recorded admission in which he stated that he killed Chitwood with a .9 mm bullet. The effect of the report, however, is simply too speculative. For example, it is reasonable to assume that the jury would have inferred that petitioner, having admitted to the murder, merely sought to impress or intimidate the undercover informant by exaggerating the size of the bullet and, correspondingly, the caliber of the weapon.

Similarly, the reports relating to the absence of blood in the sink and soil from the decedent's car fail to directly contradict the Commonwealth's evidence. The Commonwealth's theory was that petitioner mur-

dered Chitwood in petitioner's garage. The admission of the report that tended to show the absence of blood in the sink at petitioner's place of business would not have proven that the murder did not take place there, but only that the blood was not disposed of in that sink. Nor would the soil sample report have aided petitioner. Evidence presented at trial that Chitwood had driven to petitioner's garage the evening of the murder was uncontroverted. Accordingly, these reports would have had little or no impact on the prosecution's case.

Having determined that petitioner was not sufficiently prejudiced by the performance of trial counsel with respect to evidence of an alternative perpetrator or exculpatory evidence, the Court turns to petitioner's final contentions.

3. *Counsel's Improper Statements and Actions.*

Petitioner contends that trial counsel made certain improper statements and took certain improper actions both before and after trial. Specifically, petitioner alleges that:

(e) trial counsel indicated a bias against petitioner by writing a personal letter to Watson apologizing for calling him to testify at petitioner's trial;

(n) trial counsel claimed in his opening statement that he would produce a witness who saw Chitwood drive away from the petitioner's garage on the evening of the homicide; however, trial counsel failed to produce such a witness at trial;

(o) trial counsel indicated a predisposition towards being unable to successfully defend the petitioner by indicating to the trial court that "it's going to take forever to get [the records] together when we appeal this case";

(p) trial counsel admitted his preparation for trial had diminished considerably for the three weeks immediately prior to trial because he thought the court would rule favorably on his Motion to Dismiss petitioner's case for lack of a speedy trial;

(q) trial counsel elicited from petitioner upon direct examination testimony relating to petitioner's criminal background which

was otherwise inadmissible and could not have been brought out by the Commonwealth; and

(s) trial counsel allowed the Commonwealth's Attorney to improperly argue in a personal manner to the jury.

None of these claims, however, survive both prongs of the *Strickland* test.

■■■ Claims (e), (o), and (p) simply do not address trial counsel's actual conduct of the trial and, for that reason, neither demonstrate deficient performance nor prejudice.

■■■ That trial counsel brought out petitioner's prior criminal record and background as alleged in claim (q) was without question merely part of sound trial strategy. As trial counsel testified before this Court, the basis for impeaching petitioner's confession was that petitioner was merely bragging and attempting to impress or intimidate the undercover agent who petitioner believed at that time was a member of the criminal underworld. As part of that impeachment, trial counsel sought to provide evidence regarding the relationship these men had as criminals; i.e., that the men had illicit dealings. Therefore, the Court does not find the allegations of claim (q) to indicate deficient performance.

■■■ Claim (n) relates to trial counsel's failure to provide a witness to testify that he saw Chitwood drive away from petitioner's garage the evening of the murder, as indicated in his opening statement. The prosecution emphasized this failure in its closing. The Court determines that the error produced little, if any, prejudice. Had counsel not promised such a witness, the prosecution similarly could have emphasized the contention that Chitwood was last seen at the garage.

Claim (s) is equally meritless. The Court fails to perceive any prejudice resulting from the manner in which the prosecution was permitted to argue in closing.

*Conclusion*

The Court finds that the petitioner was not denied the effective assistance of counsel in violation of the sixth and fourteenth

amendments to the United States Constitution because petitioner has not met his burden of proving that trial counsel's conduct was so unreasonably deficient as to undermine the proper functioning of the adversarial process and that, as a result, the trial cannot be relied upon as having produced a just result.

Accordingly, the Court will deny this petition for habeas corpus filed pursuant to 28 U.S.C. § 2254 with respect to each and every claim.[2]

An appropriate order shall issue.

---

2. Nor does the Court find that, taken together, trial counsel's alleged errors sufficiently prejudiced petitioner's trial as to merit relief in this action.